Filed 3/16/22  Garcia v. City of Desert Hot Springs CA4/2
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| NADINE GARCIA et al., | |
| Plaintiffs and Appellants, | E075523 |
| v. | (Super.Ct.No. PSC1807458) |
| CITY OF DESERT HOT SPRINGS et al., | OPINION |
| Defendants and Respondents. | |

APPEAL from the Superior Court of Riverside County. David M. Chapman, Judge. Reversed with directions.

Inland Counties Legal Services, Kaela Henderson, Elena Castillo, Sang Banh, and Darrell K. Moore; Public Interest Law Project, Melissa A. Morris, and Craig Castellanet for Plaintiffs and Appellants.

McCune Wright Arevalo, Steven A. Haskins, and Sandy G. Gonzalez for Legal Services of Northern California, Public Counsel, Western Center for Law & Poverty, Disability Rights California, and Legal Aid Society of San Bernardino as Amici Curiae on behalf of Plaintiffs and Appellants.

1

Stream Kim Hicks Wrage & Alfaro, Theodore K. Stream, Jennifer A. Mizrahi, and Summer M. DeVore for Defendants and Respondents.

The appellants/petitioners, Nadine Garcia, James Marmor, and Helen O'Neill-Pottery, all "low-income residents of the City of Desert Hot Springs and the surrounding area," sued the City of Desert Hot Springs, Desert Hot Springs City Council, Desert Hot Springs Successor Agency (successor agency), and Desert Hot Springs Housing Authority (housing authority) to force them to carry out their long-overdue obligation to revise the housing element of the city's general plan.[1] Eventually, the parties entered a stipulated judgment, which set a timeline for the city to complete the revision.

The petitioners then moved for attorney fees and costs. Under Code of Civil Procedure, section 1021.5, "'[a] superior court may award attorney fees to (1) a successful party in any action (2) that has resulted in the enforcement of an important right affecting the public interest if (3) a significant benefit has been conferred on the general public or a large class of persons, (4) private enforcement is necessary because no public entity or official pursued enforcement or litigation, (5) the financial burden of private enforcement is such as to make a fee award appropriate, and (6) in the interests of justice the fees should not be paid out of the recovery.'" (*Vosburg v. County of Fresno* (2020) 54 Cal.App.5th 439, 449–450.)

---

[1] For ease of understanding, we refer to the petitioners collectively as "the residents" and the defendants collectively as "the city."

2

Under Code of Civil Procedure, section 1032, subdivision (b), "a prevailing party is entitled as a matter of right to recover costs." (*Friends of Spring Street v. Nevada City* (2019) 33 Cal.App.5th 1092, 1103.) However, "[i]f any party recovers other than monetary relief and in situations other than as specified, the 'prevailing party' shall be as determined by the court, and under those circumstances, the court, in its discretion, may allow costs or not" depending on "whether the party succeeded at a practical level by realizing its litigation objectives." (*Id.* at pp. 1103-1104.)

The trial judge, Riverside County Superior Court Judge David M. Chapman, denied the motion for attorney fees on the ground "it was unnecessary for Petitioners to incur . . . attorney's fees" because the city had taken steps to remedy their non-compliance before the lawsuit and continued to take such steps through the filing of the stipulated judgment. The judge concluded, "Petitioners have failed to establish 'the necessity and financial burden of private enforcement . . . such as to make [an] award appropriate.'" The judge denied the motion costs without explanation.

The trial court erred by ruling private enforcement was not necessary on the theory that the residents' action did not cause the city's compliance. Causation is irrelevant to the determination. Instead, what is relevant is the fact that enforcement was inadequate, which the residents established through the undisputed facts of the city's extreme delay in revising the housing element and the paucity of enforcement action. Since the residents also established the litigation resulted in the enforcement of an important right affecting the public interest and conferred a significant benefit

3

on a class of persons and recovered no monetary award, we will reverse the judgment and remand with directions for the trial court to determine a reasonable amount for attorney fees. Because the residents plainly achieved their litigation objectives, the trial judge also erred in denying costs.

**I**

**BACKGROUND**

A. *The Housing Element Law*

"Every city . . . must adopt a comprehensive, long-term general plan for the physical development of the land within its jurisdiction." (7 Miller & Starr, Cal. Real Estate (4th ed. 2021) § 21:6, p. 21-54, fn. omitted; see also Gov. Code, § 65300.) A general plan must include eight prescribed elements (Gov. Code, § 65302), including a housing element that complies with Government Code sections 65580-65589.11 (Housing Element Law). (Gov. Code, § 65302, subd. (c).) A city must review its housing element periodically—in most instances, every eight years. (Gov. Code, § 65588, subd. (e)(3)(A).) This eight-year interval is referred to as a planning period or a cycle.

The state Department of Housing and Community Development (department) (see Gov. Code, § 65582, subd. (c)) has statutory authority to oversee a city's preparation of its housing element. (Gov. Code, § 65585.) At least two years before a revision is due, the department must determine the number of additional housing units needed in each region. (Gov. Code, §§ 65584, subd. (b), 65584.01.) At least

one year before a revision is due, each regional council of governments—in this case, the Southern California Association of Governments (SCAG)—must allocate the number of units needed among the cities and counties in its region. (Gov. Code, § 65584, subd. (b).)

A city's housing element must show how it will meet its allocation. (Gov. Code, §§ 65583, subds. (a)(3), (c)(1), 65583.2, subd. (a).) It must include an inventory of the land currently available for residential development. (Gov. Code, §§ 65583, subd. (a)(3), 65583.2, subds. (a)-(c).) If this is inadequate to meet its allocation, it must identify additional land it can rezone to make it available for residential development. (Gov. Code, § 65583, subd. (c)(1).) The actual rezoning must occur within three years after adoption of the housing element (or earlier, under certain circumstances). (Gov. Code, § 65583, subd. (c)(1)(A).)

The city must submit a draft revision of its housing element to the department for review. (Gov. Code, § 65585, subd. (b)(1).) The city also must "collect and compile" all public comments received regarding the housing element. (Gov. Code, § 65585, subd. (b)(2).) The department has 60 days to review and respond to a draft revision and to determine whether it "substantially complies" with the Housing Element Law. (Gov. Code, § 65585, subds. (b)(3), (d).)

The city must consider the department's findings before they actually adopt a revision. (Gov. Code, § 65585, subd. (e).) If the department determines the draft revision does not substantially comply with applicable law, the city may either

(1) change the draft revision so it does comply, or (2) adopt the draft revision, with an explanation of why the city believes it does.  (Gov. Code, § 65585, subd. (f).)

Once the city adopts a revision, they must submit it promptly to the department, who then have 90 days to review and respond to the revision as adopted.  (Gov. Code, § 65585, subds. (g), (h).)  If the department finds the revision substantially complies with the Housing Element Law, there is a rebuttable presumption the revision is valid. (Gov. Code, § 65589.3.)

If the department finds a city has not complied, they can notify the attorney general. (Gov. Code, § 65585, subd. (i).) The attorney general can then sue the city to force them to comply. (Gov. Code, § 65585, subds. (*l*), (n).) In addition, any interested person can petition for a writ of traditional mandate (Code Civ. Proc., § 1085) on the ground a city's housing element does not substantially comply with the Housing Element Law.  (Gov. Code, § 65751.)

Finally, if a city "does not adopt a housing element within 120 days of the applicable deadline," they must "revise its housing element not less than every four years until [it] has adopted at least two consecutive revisions by the statutory deadline." (Gov. Code, § 65588, subd. (e)(4)(A).)

B.  *Factual Background*

October 15, 2013 was the city's deadline to finalize its housing element for the 2013 to 2021 planning period.[2]  (California Department of Housing and Community

---

[2] We take these facts from the evidence submitted with the motion for attorney

*[footnote continued on next page]*

Development, *Housing Element Update Schedule for Regional Housing Need*

*Assessment (RHNA)* (Jan. 28, 2020).)[3]

The city didn't meet this deadline. They didn't even come close. As a result,

they automatically became subject to a four-year revision requirement and were

therefore required to complete a four-year revision by October 2017. They didn't

meet this deadline either.

As far as the record shows, the city didn't even start to revise its housing

element until July 2017. At some point, they decided, despite the statutory

requirement and the already lengthy delay, that they should delay compliance further

so as to revise their entire general plan. To that end, they retained MIG, Inc., an

environmental and planning consulting firm, to prepare proposed revisions to its

general plan, including the housing element.

The agreement included a schedule which specified MIG would start work on

---

fees. In a few places, the parties cite evidence submitted with a separate motion—a motion to enforce the stipulated judgment, which the residents later took off calendar. We disregard this evidence because it was not before the trial judge when he ruled on the motion for attorney fees. The residents also requested judicial notice of eight documents. The city objected to judicial notice of only two of these on the ground they were irrelevant. Though the trial court didn't rule on the requests, given the city's failure to oppose six of them, it is appropriate to take judicial notice of those. The other two documents related to whether the residents' counsel's billing rates were reasonable, an issue which is not before us.

[3] The residents didn't formally request judicial notice of this document. However, they did cite it in their memorandum of points and authorities supporting their assertion the deadline was October 15, 2013. We deem this an informal request for judicial notice. Because we are no longer in the same cycle, the document is no longer at the URL the residents cited.

September 1, 2017, provide the draft housing element by February 2018, provide the draft general plan by April 2018, and the final general plan would be adopted by October 2018. As of February 2018, this schedule had slipped, so that the draft housing element was calendared for June 2018 and the draft general plan was calendared for February 2019.

Between July 2017 and July 2018, the city did make some progress. They had five meetings (including one conference call) with MIG, two of which featured the housing element. They obtained a traffic scoping analysis and an economic analysis for purposes of the general plan. They held a community workshop regarding the general plan, including the housing element. And in February 2018, MIG provided its recommendations regarding the housing element.

Meanwhile, in April 2018, Inland Counties Legal Services and the Public Interest Law Project (together, Inland) began "a statewide analysis of housing elements," which included investigating the city's housing element compliance. On August 1, 2018, Inland sent the city a demand letter. They noted the city had failed to revise the housing element in a timely manner, identified other statutory violations, and "demand[ed] that the City take immediate action to adopt a legally compliant housing element, as well as to meet other federal and state law obligations regarding fair and affordable housing." They also noted the right to sue the city to compel compliance and to recover attorney fees.

Settlement discussions ensued. The city attorney explained they were already working on a revised general plan, including a revised housing element. She said they expected to adopt the general plan sometime in 2019—she "hoped" by March 2019. However, Inland didn't believe this timeline was feasible, because the city had to give the department at least 60 days to review any draft revised housing element.

An Inland attorney asked whether the city would consider updating its housing element before the rest of the general plan. The city attorney said no, because updating the general plan was a "project" within the meaning of the California Environmental Quality Act (CEQA) and the city had to conduct environmental review of the project as a whole. Inland disputed this was the law under CEQA. They took the position that the city should provide a firm timeline and should make that timeline enforceable by entering into a stipulated judgment. The city said they couldn't agree "because updating the city's general plan, which included the housing element, was a tremendous undertaking . . . with many moving parts (public notice, public hearings, public feedback, workshops, environmental studies, etc.) that resulted in a more fluid timeline."

By October 2018, the city's project schedule had slipped further. A draft housing element was calendared for December 2018 and a draft general plan was calendared for June 2019. During the four months of prelitigation negotiations, the city had another conference call with MIG, obtained a draft land use designations matrix, and scheduled a second community workshop regarding the general plan—

9

including the housing element—for December 5, 2018.

On December 3, 2018, the residents filed this action. On December 14, 2018, the department notified the city they weren't in compliance with the Housing Element Law because they hadn't submitted a draft or adopted the housing element. They "reserve[d] the right to take further action," specifically including notifying the attorney general. (See Gov. Code, § 65585, subds. (i), (j).)

On January 31, 2019, the residents requested a hearing on the housing element, which the trial court was required to schedule within 120 days of the request under Government Code section 65753, subdivision (b).

In consultation with Inland, city staff drafted an ordinance that would moot some of the residents' peripheral claims. The city enacted that ordinance in February 2019. Also in February 2019, the city filed an answer and agreed to enter into negotiations toward a stipulated judgment. On March 11, 2019, the parties reported settlement negotiations were on-going and asked the court to delay the hearing until August, citing the negotiations as good cause for the delay.

On April 15, 2019, the city submitted a draft housing element to the department. On May 14, 2019, the department notified the city that they could not satisfy both the eight-year revision obligation (overdue since October 2013) and the four-year revision obligation (overdue since October 2017) with a single revision. In response, the city separated the eight-year revision from its general plan. They planned to adopt an eight-year revision first, then prepare and adopt a four-year

10

revision together with the general plan.

The city submitted revised versions of its draft housing element on May 31, 2019, June 7, 2019, and June 12, 2019. On June 13, 2019, the department found the draft housing element didn't comply with the Housing Element Law in some respects. Among other things, it said the city would have to adopt the general plan before the department would certify the housing element. On June 23, 2019, the residents made a settlement offer "that incorporated [the department]'s findings." On August 12, 2019, the city made a counteroffer.

In the meanwhile, the parties proceeded in the litigation. They obtained a new hearing date of September 13, 2019. They then briefed all the issues in dispute and submitted supporting declarations and exhibits. The residents filed their final brief on August 30, 2019.

Shortly thereafter, on September 5, 2019, the parties entered a settlement agreement resolving all issues in the case. The trial judge entered a stipulated judgment, incorporating the settlement agreement. The judgment required the city to (i) adopt a housing element in substantial compliance with the Housing Element Law by October 31, 2019, (ii) make all changes to its zoning code and general plan necessary to accommodate their regional housing needs allocation by June 30, 2020, (iii) add provisions to their zoning code and general plan by October 31, 2020, (iv) adopt a four-year revision of their housing element by November 15, 2020; (v) encourage public participation in the drafting of the four-year revision, and

11

(vi) adopt a timely housing element for the 2021-2029 planning period. The judgment did not contain a monetary award for the residents but allowed them to move for attorney fees and costs if, after first attempting to resolve fees and costs with the city, they were unable to do so.

Under the judgment, if the city missed a deadline, they could not grant any building permits, zoning changes, or subdivision map approvals (except permits for emergency shelters and affordable housing) until they came into compliance. The city complied by adopting a revised housing element on October 22, 2019.

As of the date of the city's opposition to the attorney fee motion, they had sent the department several drafts of a four-year revision of the housing element and expected to adopt it, as part of a revised general plan, by June 2020.

C. *The Request for Attorney Fees and Costs*

The settlement agreement between the residents and the city specified they retained their right to seek attorney fees. "Nothing in this Agreement shall be construed as limiting or eliminating the rights of Petitioners or their Attorneys of Record to seek litigation costs, including attorneys' fees . . . . Any . . . motion for an award of attorneys' fees and costs shall be due 90 days from the date of entry of the Stipulated Judgment."[4]

---

[4] The parties settled with the successor agency and the housing authority earlier and agreed to stay deadlines for seeking attorney fees until all claims had been resolved.

In February 2020, the residents filed a timely motion for $328,255 in attorney fees against the city. They also sought $94 in costs. Regarding the necessity of private enforcement, they argued that, during the four months between their demand letter and the filing of the action, "the City neither came into compliance nor committed to a firm timeline for compliance." They also argued the department did nothing until they had filed their lawsuit, and even then, the department sent only an initial letter, with no follow-up letter.

In opposition, the city argued there was no need for private enforcement "because: (1) the City was already over a year into updat[ing] its housing element before [the residents] became involved; and (2) [the department] could have taken action against the City, if any action later became necessary."

Before holding a hearing, the trial judge issued a tentative ruling granting the motion in part and awarding the reduced amount of $121,485 in attorney fees. After hearing argument, however, he vacated his tentative, indicated he would "review this matter in light of counsels' arguments," and continued the hearing.

After further argument, the trial judge denied the motion. He found private enforcement was unnecessary. "Petitioners were successful in obtaining a stipulated judgment once the City was in a position to agree to a timeline. Both the City and Petitioner sought the same result. Although the judgment is enforceable, it is questionable whether the public right aro[se] out of the 'enforcement' efforts of petitioner[s]."

13

"[P]rior to the time that Petitioners sent their initial demand letter to City on August 1, 2018, . . . City recognized its non-compliance and was well underway with taking steps to come into compliance." "[A]fter Petitioners sent their initial demand letter on August 1, 2018, and until City was notified on December 12, 2018 that the petition in this case had been filed, City continued to make adequate progress to remedy their noncompliance." "[The city a]ttorney . . . was responsive to Petitioners' demand letter, acknowledged City's noncompliance, took reasonable steps to apprise Petitioners' counsel of the steps City had taken and were planning to . . . remedy City's noncompliance, and made efforts to keep Petitioners informed and involved in the decision-making process . . . ." "Additionally, . . . after service of the petition, until the parties reached a stipulated settlement, City continued to make progress towards compliance." "The City at all times acknowledged its noncompliance and its desire to adopt a proper plan as soon as reasonably possible and still comply with all requirements such as public notice, public hearings, public feedback, workshops, environmental studies, etc. Once the process was far enough along that a firm timeline was ascertainable, the City entered into a stipulated settlement."

The trial judge concluded "it was unnecessary for Petitioners to incur $328,255 in attorney's fees in order to get the City to comply with State Housing Element Laws within a reasonable time frame. Long before Petitioners contacted City, City had taken steps to remedy their non-compliance and continued to do so through the filing of the stipulated judgment. Therefore, Petitioners have failed to establish 'the

14

necessity and financial burden of private enforcement such as to make [an] award appropriate.'" (Brackets omitted.) The ruling also denied the residents' motion for costs without explanation, despite acknowledging they were "successful in obtaining a stipulated judgment."

The residents filed a timely notice of appeal of the order denying an award of attorney fees and costs.

## II

## ANALYSIS

Code of Civil Procedure, section 1021.5 provides: "Upon motion, a court may award attorneys' fees to a successful party against one or more opposing parties in any action which has resulted in the enforcement of an important right affecting the public interest if: (a) a significant benefit, whether pecuniary or nonpecuniary, has been conferred on the general public or a large class of persons, (b) the necessity and financial burden of private enforcement . . . are such as to make the award appropriate, and (c) such fees should not in the interest of justice be paid out of the recovery, if any."

"The burden of proving the existence of the[se] statutory elements [other than the 'interest of justice' element] is placed on the party requesting attorney fees . . . . [Citations.] When a litigant establishes those elements, the court's discretion to deny fees is quite limited. [Citation.] In that situation, attorney fees must be awarded unless special circumstances render such an award unjust. [Citations.]" (*Vosburg v.*

15

*County of Fresno*, *supra*, 54 Cal.App.5th at p. 450.) We normally apply the abuse of discretion standard of review to a trial judge's ruling on a motion for attorney fees, however de novo review ""'is warranted where the determination of whether the criteria for an award of attorney fees and costs in this context have been satisfied amounts to statutory construction and a question of law.'"" (*Ibid.*)

The residents argue the trial judge's reasoning was erroneous because the "necessity of private enforcement" prong of the test does not require proof that the plaintiff caused the defendant's change of behavior; it requires only proof of an absence of public enforcement, which is established in this case. They are correct. "[T]he 'necessity . . . of private enforcement' has long been understood to mean simply that public enforcement is not available, or not sufficiently available." (*Conservatorship of Whitley* (2010) 50 Cal.4th 1206, 1217.) "Thus, necessity is shown where public enforcement of the right affecting the public interest in the case 'is inadequate.'" (*Bui v. Nguyen* (2014) 230 Cal.App.4th 1357, 1367.)

Causation is irrelevant. "[T]he statutory requirement of 'necessity . . . of private enforcement' addresses the issue of the comparative availability of *public* enforcement, *not the causal relationship between the claimant's action and the result*." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1298, second italics added.) It follows that the trial court erred by finding the residents had not proven the "necessity of private enforcement" due to lack of proof that their efforts caused the city to comply with the law.

16

There can be no question the residents showed their litigation was necessary in the sense that public enforcement was not available or not sufficiently available to achieve compliance. It is uncontested the city was *several years* late in revising the housing element. The revisions were originally due on October 15, 2013. They failed to meet that deadline and then failed to meet the new October 2017 deadline imposed as a result of the first failure. Though the city had begun taking steps to come into compliance, they didn't even start to revise the housing element until July 2017. They had plans to provide a draft housing element by February 2018, but that deadline too had slipped. By August 1, 2018, when attorneys for the residents contacted the city, prospects of compliance were still distant. Initial negotiations weren't fruitful, and the residents filed their lawsuit in December 2018. Only then did the department contact the city about its lack of compliance with the law. This uncontested timeline establishes public enforcement of the obligation to revise the housing element was either not available or, at minimum, insufficiently available.

Moreover, though the city had the opportunity to settle the case early, they didn't do so. They engaged in settlement discussions starting in February, extending the 120 day deadline for a hearing on the housing element. They then engaged in full blown litigation of the case in tandem with settlement talks. By August, the parties had submitted a full battery of briefs, declarations, and exhibits before notifying the court they had settled just a week before the September 13 hearing.

17

The settlement and resulting judgment required the city to adopt a housing element in the next month, make changes to its zoning code and general plan to accommodate regional housing needs by June of the next year, add provisions to its zoning code and general within about a year, adopt a four-year revision of the housing element by November 15, 2020, and adopt a timely housing element for the next planning period. Failure to comply would result in limitations to the city's ability to grant building permits, make zoning changes, or approve subdivision map changes until they came into compliance. The litigation timeline shows the city had the opportunity to settle early if the litigation weren't necessary, but instead chose to extend the fight for several months before acquiescing to a judgment allowing for enforcement of most of the residents' demands.

The residents argue they have also shown adequately that their litigation contributed to the "enforcement of an important right" and helped secure a "significant benefit" to a large class of people. We agree. Petitioners are successful parties because they obtained a stipulated judgment that includes nearly all of the relief sought in their Petition.

Planning for the city's affordable housing needs implicates an important right affecting the public interest. In the Housing Element Law, the Legislature declares: "The availability of housing is of vital statewide importance, and the early attainment of decent housing and a suitable living environment for every Californian, including farmworkers, is a priority of the highest order." (Gov. Code, § 65580(a).)

18

Compelling the city to meet their obligations under that law benefited low-income residents of Desert Hot Springs generally. Further, while the law accepts that in some cases it may be appropriate for attorney fees to be paid out of settlement proceeds (Code Civ. Proc., § 1021.5, subd. (c)), in this case the residents secured injunctive relief but no monetary recovery from which fees could be paid.

Where, as here, a petitioner has met the statutory requirements for attorney fees, the trial judge's discretion to deny an award is limited, and more properly concerns the *amount* of the award. The private attorney general theory requires a "full fee award 'unless special circumstances would render such an award unjust.'" (*Serrano v. Unruh* (1982) 32 Cal.3d 621, 633.) "The range of discretion granted to superior courts by [Code of Civil Procedure] section 1021.5's use of the permissive term 'may' is limited," and "attorney fees must be awarded when the statutory criteria are met unless special circumstances render such an award unjust." (*Robinson v. City of Chowchilla* (2011) 202 Cal.App.4th 382, 391.) Accordingly, the residents, who have demonstrated they meet the requirements of section 1021.5, are entitled to an award of fees.

Petitioners also sought $94 in litigation costs, which the trial judge denied without explanation. Though awarding costs for a party who doesn't recover monetary damages is discretionary, it's not contested that the residents achieved their litigation objectives, and they are prevailing parties for purposes of Code of Civil Procedure section 1032. (See *Friends of Spring Street v. Nevada City*, *supra*, 33

19

Cal.App.5th at pp. 1105-1107.) They are therefore entitled to recover costs. The trial judge abused his discretion by denying costs under these circumstances.

We therefore reverse the order denying fees and costs and remand for the trial judge to determine the reasonable amount of attorney fees and the appropriate amount of costs to be awarded to the residents.

## III

## DISPOSITION

We reverse the order denying attorney fees and costs and remand for the trial court to hold a hearing on the appropriate amount of attorney fees and costs to award. Respondents shall bear appellants' costs on appeal.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

SLOUGH                          
                                                    J.

We concur:

RAMIREZ                          
                    P. J.

RAPHAEL                          
                    J.